**21 MAG 309**

Approved: _____
             MICAH F. FERGENSON
             Assistant United States Attorney

Before:   THE HONORABLE ONA T. WANG
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - X
                                  :
 UNITED STATES OF AMERICA         :   **SEALED COMPLAINT**
                                  :
         - v. -                   :   Violations of 18 U.S.C.
                                  :   §§ 922(g)(1),
 WARREN MICHAEL WILDER,           :   924(a)(2), and 2.
     a/k/a "Supreme,"             :
     a/k/a "Preme,"               :   COUNTY OF OFFENSE:
                                  :   BRONX
              Defendant.          :
                                  :
- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

    JOSE LIZARDO, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD"), and charges as follows:

### COUNT ONE
(Felon in Possession of Ammunition)

    1.   On or about August 31, 2020, in the Southern District of New York and elsewhere, WARREN MICHAEL WILDER, a/k/a "Supreme," a/k/a "Preme," the defendant, knowing he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess ammunition, to wit, seven Luger 9-millimeter shell casings, and the ammunition was in and affecting commerce.

    (Title 18, United States Code, Sections 922(g)(1), 924(a)(2), and 2.)

    The bases for my knowledge and the foregoing charge are, in part, as follows:

2. I am a Detective with the NYPD and I have been personally involved in the investigation of this matter. This affidavit is based in part upon my conversations with law enforcement agents and others and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3. Based on my involvement in this investigation, I am aware that on or about August 31, 2020, WAYNE J. MORGAN, JR., a/k/a "Wayne S. Morgan," a/k/a "Jason Morgan," (hereafter, "MORGAN") shot two individuals ("Victim-1" and "Victim-2") outside in the vicinity of an apartment building in the Bronx (the "Apartment Building").[1]

4. For the reasons explained below, I believe that WARREN MICHAEL WILDER, a/k/a "Supreme," a/k/a "Preme," the defendant, possessed the pistol and ammunition used in the August 31, 2020 shooting. Specifically, I believe that WILDER gave the pistol and ammunition to MORGAN immediately prior to the shooting. Unless otherwise noted, the following facts are based on my review of relevant surveillance video.

    a. On or about August 31, 2020, shortly before 3:00 p.m., MORGAN was outside in the vicinity of the Apartment Building. MORGAN was wearing a black tee shirt. Others, including Victim-1 and Victim-2, were also outside in the vicinity of the Apartment Building.

    b. At approximately 2:57 p.m., MORGAN went inside the Apartment Building. Victim-1 and Victim-2 remained outside. After entering the Apartment Building's lobby, MORGAN walked immediately to an apartment (the "Apartment"), the entrance to which is directly off of the lobby and visible on the lobby's surveillance video camera.

    c. After entering the lobby through the Apartment Building's front entrance, MORGAN knocked on the door

---

[1] Based on that shooting, MORGAN was charged with being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2. *See United States v. Morgan*, 20 Cr. 543 (GHW). MORGAN has been arrested and is detained.

of the Apartment several times. In between knocks, MORGAN paced in the lobby. At approximately 2:59 p.m., the door to the Apartment was opened and MORGAN walked to the door's threshold, where he stood for a few seconds, partially visible on the lobby's surveillance video. During those seconds, MORGAN removed his black tee shirt and was holding it in his hands. MORGAN then fully entered the Apartment, the interior of which is not shown on video surveillance.

        d. Approximately 47 seconds later, MORGAN emerged from the Apartment and immediately began to exit the Apartment Building through a side exit. MORGAN was not wearing his shirt and instead had it in his hands. It appears based on my experience that MORGAN had wrapped his shirt around an object he was carrying. Additional video surveillance cameras captured MORGAN running around the building, with his black shirt wrapped around his right hand, and exiting back onto the sidewalk of the street where Victim-1 and Victim-2 had remained. Once back on the street, MORGAN removed the tee shirt from his right hand, exposing a pistol that MORGAN was holding in his right hand. MORGAN fired multiple gunshots at Victim-1 and Victim-2, striking Victim-1 in the arm and Victim-2 in the chest, and causing serious physical injuries.

        e. Meanwhile, video surveillance cameras also captured WILDER's movements during the events described above in paragraph 4(e). I have interviewed WILDER in person and recognize him to be the individual shown in the video recordings discussed below.

        i. Approximately 2 seconds after MORGAN emerged from the Apartment, WILDER stuck his head out of the Apartment's entrance and looked right, then left. WILDER then walked out of the Apartment, across the Lobby, and exited the Apartment Building through its front exit—that is, a different exit from the one MORGAN used after MORGAN emerged from the Apartment.

        ii. WILDER walked through the Apartment Building's front outdoor vestibule area, which is enclosed by a metal gate, and opened the gate's door. WILDER stood at the threshold of the gate's door, holding the door ajar. Victim-2 walked over to WILDER. Both Victim-2 and WILDER began looking to their right, which is the direction from which MORGAN emerged onto the street. Once shots were fired, WILDER retreated back from the door into the vestibule area, but Victim-2 did not make

it back through the door and was shot in the chest, collapsing on the sidewalk.

        iii.    WILDER continued walking back through the vestibule area towards the lobby, at times looking back at Victim-2 on the ground. As WILDER was walking up the steps to the lobby, he looked back at Victim-2 and made a gesture with his arm, extending it out towards Victim-2 and then quickly sweeping it back to his body, while saying something. Although there is no audio on the video surveillance recording of the vestibule area, based on the context, WILDER's gesturing, and my experience, I believe that WILDER was expressing frustration that Victim-2 had not come back inside the vestibule area in the same way WILDER had. A few seconds later, WILDER reermeged from the Apartment Building with a phone to his ear. Shortly thereafter, NYPD officers arrived and delivered aid to Victim-2.

    5.    Based on, among other things, my interview of WILDER, which took place in the Apartment, I know that WILDER resides in the Apartment, as does Victim-2, who is WILDER's nephew. During my interview of WILDER, WILDER stated in sum and substance, "Yeah, my name's Supreme."

    6.    I have reviewed the contents of the cell phone that MORGAN had in his possession at his arrest pursuant to a judicially authorized search warrant. The phone has recordings of phone calls between MORGAN and others, including WARREN MICHAEL WILDER, a/k/a "Supreme," a/k/a "Preme," the defendant.

    a.    In a recorded discussion between MORGAN and WILDER, WILDER did almost all of the talking and made the following statements, in sum and substance:

> WILDER:    Yo, you good my n****? I ain't mad at you n**** I'm just hoping [Victim-2] don't wake up and give you up. You know what I'm saying, I ain't mad at you, you did what you did. And he shouldn't have been in the way. I opened the gate and told him to come in when I came in. [. . .] You know they got some shells -- my joints is on them shits. Yeah, my prints is on them shits. Cause I didn't -- you didn't give me no time, I just randomly threw them in there for you. But you safe though, right? Heyo, whatever you do my n**** don't get caught with that thing. Don't get caught with it. Try to put

4

>it somewhere, let me know, I'll go get it, so you don't get caught with it.  Please don't. That's finished, me and you be finished. You know, but other than that, stay low. They got your -- they got your video and n****s in the building told on you too. [. . .] Don't go to nobody that you fucked with in the past, anyone you had contact with [. . .] Yo, like I said, you gotta get rid of that boom, put it somewhere, let me know. [. . .] N****s gave it up to the point that it was like, "Yo, he got on the bus."  I'm like, oh these n**** are [inaudible] like that? N****s need to come back and give all these n****s a taste of medicine. [. . .] Like I said, get low, low. If you need a few dollars to go somewhere, hit me, I'll give it to you.

Based on my involvement in this investigation and my training and experience, I believe that in the recorded phone call above WILDER was discussing the August 31, 2020 shooting, and stated in sum and substance that (i) WILDER is not angry at MORGAN for shooting WILDER's nephew, (ii) WILDER had tried to tell his nephew to come inside before the shooting, (iii) WILDER supplied MORGAN with the pistol and its ammunition, (iv) the pistol and/or the ammunition had WILDER's fingerprints on them; and (v) WILDER will assist MORGAN in evading law enforcement, including by concealing evidence, namely, the pistol used in the shooting.

      b.  In a recorded call between MORGAN and another individual ("Individual-1"), MORGAN and Individual-1 discussed Victim-1, Victim-2, and WILDER.  Among other things, MORGAN repeatedly asked how Victim-2 and WILDER were doing.  MORGAN refers to WILDER as "Preme," which based on my training and experience is short for WILDER's alias of "Supreme."  The conversation included the following exchange, in sum and substance:

>MORGAN: The only reason why I keep asking for 'Preme 'cause like I said Preme you know what I mean -- n**** looked out 'cause I, I -- you know what I mean I needed somebody at the time, ya know what I'm saying.  And Preme was the only one that was like, "Yo."  You know what I'm saying.  So I want to make sure he aight, you know what I'm saying.

5

>    Individual-1:   Mm-hm. The main thing is, only thing that he worried about is, ya know what I mean, making sure candy is safe, ya know what I'm saying. Making sure that candy is safe. That's -- that's his most worry, is making sure that candy is safe, you hear me.

Based on my involvement in this investigation and my training and experience, I believe that Individual-1's reference to "candy" refers to the pistol used by MORGAN in the shooting.

       7.   Based on my review of NYPD records, I know that, following the August 31, 2020 shooting, members of the NYPD responded to the scene and recovered seven Luger 9-millimeter shell casings (the "Ammunition"). Based on my training and experience, and my communications with other law enforcement agents, including a Special Agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives, who is familiar with the manufacturing of firearms and ammunition, I am aware that the Ammunition was not manufactured in the State of New York.

       8.   I have reviewed criminal history records pertaining to WARREN MICHAEL WILDER, a/k/a "Supreme," a/k/a "Preme," the defendant. Those records show, among other things, that on or about March 26, 2001, WILDER was convicted in Queens County Supreme Court, after a jury trial, of three felony offenses, all relating to criminal possession of firearms: two counts of criminal possession of a loaded firearm in the third degree, in violation of New York Penal Law § 265.02(4); and one count of criminal possession of a weapon in the third degree, in violation of New York Penal Law § 265.02(1). Those offenses are punishable by imprisonment for a term exceeding one year. On or about May 30, 2001, WILDER was sentenced principally to seven years' imprisonment for those offenses.

WHEREFORE the deponent requests that a warrant be issued for the arrest of WARREN MICHAEL WILDER, a/k/a "Supreme," a/k/a "Preme," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

                                                 S/ Jose Lizardo /otw.   Badge No. 2113
                                                 JOSE LIZARDO
                                                 Detective
                                                 New York City Police Department

Sworn to before me through
reliable electronic means this
11th day of January 2021

_____
THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

7